IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>and<br>LOUISIANA DEPARTMENT<br>OF ENVIRONMENTAL QUALITY,<br><br>Plaintiffs,<br><br>v.<br><br>INNOPHOS, INC.,<br><br>Defendant. | Civil Action No. 17-26-SDD-RLB<br><br>**CONSENT DECREE** |

## I.  BACKGROUND

A.     Plaintiff United States of America, on behalf of the United States Environmental

Protection Agency ("EPA"), and Plaintiff Louisiana Department of Environmental Quality

("LDEQ"), an agency of the State of Louisiana to which the Louisiana Legislature has delegated

the power and duty to enforce the Louisiana Environmental Quality Act ("EQA") and Louisiana

Environmental Quality Regulations, including the authority to bring actions in courts of

competent jurisdiction for violations of the EQA (La. R.S. 30:2001 *et seq.*) and Louisiana's

Hazardous Waste Regulations (LAC 33:V. Subpart I) (collectively, "the Plaintiffs"), have filed a

Complaint ("the Complaint") in this action concurrently with this Consent Decree, alleging that

Defendant Innophos, Inc. ("Innophos" or "Defendant") violated the Resource Conservation and

Recovery Act ("RCRA"), 42 U.S.C. § 6901(a) *et seq.*, and the EQA, La.R.S.30:2001 *et seq.*, at

the purified phosphoric acid manufacturing facility that Innophos owns and operates in Geismar,

Louisiana ("the Facility").  The Complaint alleges that Innophos, from August 13, 2004 until

1

December 2012, routinely sent a hazardous waste ("RP Pondwater") from its initial filtration of Green Acid for disposal to the Geismar, Louisiana, phosphoric acid facility ("PCS Geismar Facility") owned and operated by PCS Nitrogen Fertilizer, L.P. ("PCS Nitrogen"), which was not permitted as a RCRA hazardous waste treatment, storage, or disposal facility and, thus, not permitted to accept hazardous waste.  This RP Pondwater waste exhibited the hazardous toxicity characteristic for arsenic, cadmium, and chromium and the hazardous corrosivity characteristic as those characteristics are defined in 40 C.F.R. Part 261, Subpart C.  The Complaint also alleges that Innophos, from August 13, 2004 until the date of lodging of this Consent Decree, routinely sent a hazardous Raffinate waste ("Raffinate"), separated during its purified phosphoric acid manufacturing process through solvent extraction of Green Acid, for disposal to the PCS Geismar Facility, which was not permitted as a RCRA hazardous waste treatment, storage, or disposal facility and, thus, not permitted to accept hazardous waste.  The Raffinate exhibited the hazardous toxicity characteristic for cadmium and chromium and the hazardous corrosivity characteristic, as those characteristics are defined in 40 C.F.R. Part 261, Subpart C.  The Plaintiffs allege in the Complaint that both the RP Pondwater and Raffinate are regulated hazardous wastes and that the Defendant's handling of both the RP Pondwater and Raffinate during the time periods specified above violated the federally-authorized regulations at Title 33 of the Louisiana Administrative Code ("LAC") Part V, Chapters 1 through 51 (RCRA Section 3005, 42 U.S.C. § 6925, and the implementing regulations as set forth in 40 C.F.R. Parts 262 through 270).

B.      Defendant makes no admission of law or fact with respect to the allegations in the Complaint and denies any non-compliance with, or violations of, any law or regulation identified therein, or in this Consent Decree.  Defendant has conducted itself in good faith in its discussions

2

with the Plaintiffs concerning the violations alleged in the Complaint and has already implemented operating changes and corrective measures to address, in advance, certain portions of injunctive relief as reflected in background Paragraph F.

C.      Defendant further maintains that Defendant is and has been in compliance with the Amended and Restated Acid Purchase Agreement among Rhodia, Inc., PCS Sales (USA), Inc., and PCS Nitrogen dated March 23, 2000 ("Acid Purchase Agreement") and that, pursuant to that agreement, it is not responsible for compliance with applicable laws and regulations relating to the RP Pondwater and Raffinate at the PCS Geismar Facility.

D.      The PCS Geismar Facility was also the subject of an inspection regarding RCRA compliance and was issued an Inspection Report that noted Areas of Concern at that facility, including, among other concerns, non-compliance related to the RP Pondwater and Raffinate. This Consent Decree does not address these Areas of Concern at the PCS Geismar Facility, nor does it resolve any violations of RCRA or other laws at the PCS Geismar Facility or any liability of the owners or operators of that facility.

E.      The objective of the Parties in this Consent Decree is to resolve the civil claims alleged in the Complaint by: 1) codifying and establishing agreed-upon injunctive relief that has been or will be performed, whereby Innophos has modified or shall modify certain operating practices with respect to its management of the RP Pondwater and Raffinate; and 2) assessing an appropriate civil penalty.

F.      In December 2012, in response to Plaintiffs' enforcement action, Innophos ceased sending the RP Pondwater to the PCS Geismar Facility and commenced operation of a new in-process system to filter arsenic and phosphogypsum entrained in the Green Acid and to manage this filtrate ("Dearsenate") as a regulated hazardous waste.

3

G.      On April 14, 2014, Innophos applied for an underground injection deep well permit from the Louisiana Department of Natural Resources ("LDNR"), which would allow the construction of deep wells, and once fully permitted, allow the Raffinate to be injected into the Innophos Deep Well System.  On December 30, 2015, Innophos submitted an Exemption Approval Request (No Migration Petition) to EPA Region 6 to obtain the requisite exemption approval.  PCS Nitrogen has also submitted an underground injection deep well permit application to LDNR that would allow the construction of deep wells, and once fully permitted, allow the Raffinate to be injected into the PCS Geismar Deep Well System.

H.      The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

I.      The Parties agree that the United States' filing of the Complaint and entry into this Consent Decree constitute diligent prosecution by the United States and LDEQ, under Section 7002(b)(1)(B) of RCRA, 42 U.S.C. § 6972(b)(1)(B), of all matters alleged in the Complaint and addressed by this Consent Decree through the date of lodging of this Consent Decree.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section II, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367, and Sections 3008(a) and (g) of RCRA, 42 U.S.C. §§ 6928(a) and (g), and over the Parties.  This Court has supplemental jurisdiction over the State

law claims, asserted by the State of Louisiana under the EQA, La.R.S. 30:2001 *et seq.*, and the

Louisiana Hazardous Waste Regulations, LAC 33:V. Subpart I.  Venue lies in this District

pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); and 28 U.S.C. §§ 1391(b), 1391(c)

and 1395(a), because Innophos does business in the Middle District of Louisiana, the Facility is

located in this District, and the alleged violations of RCRA and the EQA, and the Louisiana

Hazardous Waste Regulations occurred in this District.  For purposes of this Decree, or any

action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and

any such action and over Defendant and consents to venue in this judicial district.

       2.      Pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2), notice of the

commencement of this action has been given to LDEQ.

       3.      For purposes of this Consent Decree only, Defendant agrees that the Complaint

states claims upon which relief may be granted pursuant to Sections 3008(a) and (g) of RCRA,

42 U.S.C. §§ 6928(a) and (g); and La.R.S. 30:2025.

### III.    APPLICABILITY

       4.      The obligations of this Consent Decree apply to and are binding upon the

Plaintiffs and Defendant and any successors, assigns, or other entities or persons otherwise

bound by law.

       5.      No transfer of ownership or operation of all or a portion of the Facility subject to

the obligations of this Consent Decree, whether in compliance with the procedures of this

Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the

Decree are implemented.  At least thirty (30) Days prior to such transfer, Defendant shall provide

a copy of this Consent Decree to the proposed transferee and shall simultaneously provide

written notice of the prospective transfer, together with a copy of the proposed written

agreement, to EPA Region 6, the United States Department of Justice, and LDEQ in accordance

with Section XIV of this Decree (Notices). Any attempt to transfer ownership or operation of

the Facility (or a portion thereof subject to the obligations of this Consent Decree) without

complying with this Paragraph constitutes a violation of this Decree. Notwithstanding the

foregoing, in the event (i) of any transfer of ownership or operation of all or a portion of the

Facility by Defendant to an Affiliate of Defendant pursuant to a corporate reorganization or

otherwise, or (ii) of a person's or entity's acquisition, directly or indirectly, of all or a portion of

the outstanding equity securities of Defendant or any Affiliate of Defendant, Defendant shall

provide, simultaneously with the notice of the prospective transfer, a written certification that

such transfer will not impede Defendant's ability to comply with the terms of this Decree;

however, for such a transfer, Defendant is not required to provide a copy of the proposed written

agreement to EPA Region 6, the United States Department of Justice, and LDEQ, unless, after

receiving the notice of the prospective transfer, one or more of those agencies request a copy.

   6.  Nothing in this Decree precludes transfer of the PCS Geismar Deep Well System

either to Innophos (or its Affiliates) or to a joint venture owned and/or operated by PCS Nitrogen

(or its affiliates) and Innophos (or its Affiliates), or precludes an operating agreement between

Innophos and PCS Nitrogen regarding the PCS Geismar Deep Well System; provided, however,

that such transfer is done in compliance with EPA, LDEQ, and LDNR requirements for transfer

of underground injection wells, including any needed permit revisions to recognize the transfer.

At least thirty (30) Days prior to such transfer or the effective date of such an operating

agreement that involves Defendant, Defendant shall provide written notice of the prospective

transfer or operating agreement, together with a copy of the proposed agreement, to EPA

Region 6, the United States Department of Justice, and LDEQ in accordance with Section XIV of this Decree (Notices).

7.     Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties include the obligation to perform actions required by any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall include in any contract with such a contractor a condition that performance of the work be in conformity with the terms of this Consent Decree.

8.     In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.     DEFINITIONS

9.     Terms used in this Consent Decree that are defined in RCRA or in regulations authorized by RCRA shall have the meanings assigned to them in RCRA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.     "Acid Purchase Agreement" shall mean the Amended and Restated Acid Purchase Agreement among Rhodia, Inc., PCS Sales (USA), Inc., and PCS Nitrogen Fertilizer, L.P., dated March 23, 2000;

b.     "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with, Defendant;

c.     "Complaint" shall mean the complaint filed by the Plaintiffs in this action against the Defendant;

d.     "Consent Decree" or "Decree" shall mean this Decree;

7

e.      "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

f.      "Dearsenate" shall mean the material resulting from the Innophos Facility's in-process system, commencing operation in December 2012 (as described in Section I., Paragraph F), used to filter out arsenic compounds and phosphogypsum from the Green Acid and disposed of as hazardous waste;

g.      "Defendant" shall mean Innophos, Inc.;

h.      "Effective Date" shall have the definition provided in Section XV;

i.      "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

j.      "EQA" shall mean the Louisiana Environmental Quality Act;

k.      "Facility" shall mean Defendant's purified phosphoric acid processing facility located in Geismar, Louisiana;

l.      "Green Acid" shall mean phosphoric acid produced by the co-located and integrated PCS Geismar Facility and delivered to the Innophos Facility pursuant to the Acid Purchase Agreement;

m.      "Innophos Deep Well System" shall mean at least one Class I underground injection control well and the aboveground facilities associated with same for the sole purpose of preparing and, as needed, storing the materials contemplated for injection at the Innophos Facility;

n.      "LDEQ" shall mean the Louisiana Department of Environmental

8

Quality, an agency of the State of Louisiana;

      o.     "LDNR" shall mean the Louisiana Department of Natural Resources;

      p.     "Paragraph" shall mean a portion of this Decree identified by an

Arabic numeral;

      q.     "Parties" shall mean the United States, LDEQ, and Defendant;

      r.     "PCS Geismar Facility" shall mean the PCS Nitrogen Green Acid facility

located in Geismar, Louisiana;

      s.     "PCS Geismar Deep Well System" shall mean at least one Class I

underground injection control well and the aboveground facilities associated with same for the

sole purpose of preparing and, as needed, storing the materials contemplated for injection at the

PCS Geismar Facility;

      t.     "PCS Nitrogen" shall mean PCS Nitrogen Fertilizer, L.P.;

      u.     "Plaintiffs" shall mean the United States and LDEQ;

      v.     "RCRA" shall mean the Resource Conservation and

Recovery Act, 42 U.S.C. § 6901(a) *et seq.*;

      w.     "RP Pondwater" shall mean the material that was generated by Innophos

or its predecessors in interest from initial processing of Green Acid and sent to the PCS Geismar

Facility for disposal from at least August 13, 2004 to December 2012.

      x.     "Raffinate" shall mean the material that is separated from Green Acid to

remove impurities at the Innophos Facility, as described in the Acid Purchase Agreement;

      y.     "Section" shall mean a portion of this Decree identified by a

Roman numeral;

      z.     "State" shall mean the State of Louisiana, acting on behalf of

LDEQ;

        aa.    "Triggering Date" shall mean the first date on which both (i) and (ii) below have occurred:

        (i)    LDNR makes a final decision not to grant an operating permit for the Innophos Deep Well System pursuant to LAC 43:XVII, Subparts 1-2; or EPA or LDEQ makes a final decision not to grant an Exemption Approval Request (No Migration Petition) for the Innophos Deep Well System pursuant to 40 C.F.R. § 148.22 and LAC 33:V.2271 or LAC 33:V.2273, respectively; or Innophos abandons its application for such permit; and

        (ii)    LDNR makes a final decision not to grant an operating permit for the PCS Geismar Deep Well System pursuant to LAC 43:XVII, Subparts 1-2; or EPA or LDEQ makes a final decision not to grant an Exemption Approval Request (No Migration Petition) for the PCS Geismar Deep Well System pursuant to 40 C.F.R. § 148.22 and LAC 33:V.2271 or LAC 33:V.2273, respectively; or PCS Nitrogen abandons its application for such permit; and

        bb.  "United States" shall mean the United States of America, acting on behalf of EPA.

## V. <u>CIVIL PENALTY</u>

    10.    Within thirty (30) Days after the Effective Date of this Consent Decree, or twenty (20) Days after receiving payment instructions as described in Paragraph 11, whichever is later, Defendant shall pay the sum of ONE MILLION THREE HUNDRED NINETY-EIGHT THOUSAND DOLLARS ($1,398,000) as a civil penalty for the violations alleged in the Complaint, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging. Of this amount, a civil penalty of SIX HUNDRED NINETY-NINE THOUSAND DOLLARS

($699,000) shall be paid to the United States and a civil penalty of SIX HUNDRED NINETY

NINE THOUSAND DOLLARS ($699,000) shall be paid to the State of Louisiana in accordance

with Paragraph 11; the interest shall be paid to each governmental entity in proportion to its

share (fifty percent (50%) to each Plaintiff).

      11.    <u>Payment Instructions</u>:

          a.    Defendant shall pay the civil penalty due to the United States by FedWire

Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written

instructions to be provided to Defendant, following the Effective Date of the Consent Decree, by

the Financial Litigation Unit of the U.S. Attorney's Office for the Middle District of Louisiana.

At the time of payment, Defendant shall send a copy of the EFT authorization form and the EFT

transaction record, together with a transmittal letter, which shall state that the payment is for the

civil penalty owed pursuant to the Consent Decree in <u>United States and LDEQ v. Innophos, Inc.</u>,

and shall reference the civil action number and DOJ case number 90-7-1-08688, to the United

States in accordance with Section XIV of this Decree (Notices); by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

        EPA Cincinnati Finance Office
        26 Martin Luther King Drive
        Cincinnati, Ohio  45268

          b.    Defendant shall pay the civil penalty due to the State by EFT to LDEQ in

accordance with instructions to be provided by LDEQ following the Effective Date of this

Consent Decree.  At the time of payment, Defendant shall send a copy of the EFT authorization

form and the EFT transaction record, together with a transmittal letter, which shall state that the

payment is for the civil penalty owed pursuant to the Consent Decree in <u>United States and LDEQ</u>

<u>v. Innophos, Inc.</u>, and shall reference the civil action number, to LDEQ in accordance with

Section XIV of this Decree (Notices).

12.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating its federal, state, and local income tax.

## VI. COMPLIANCE REQUIREMENTS

13.     Defendant Innophos shall comply with Louisiana Hazardous Waste regulations at Title 33 of the LAC, Part V, Chapters 1 through 51 (RCRA Section 3005, 42 U.S.C. § 6925, and the implementing regulations as set forth in 40 C.F.R. §§ 262.11, 262.12(c), 262.41, 266.21, 266.22, 268.7, 270.1, and 270.10), regarding the generation, transportation, treatment, storage, and disposal of the RP Pondwater, Dearsenate, and Raffinate. Innophos shall ensure that any spills, leaks or overflows of Dearsenate and Raffinate are contained and managed in a manner that minimizes any potential for releases to the environment and in accordance with any applicable regulatory requirements. Nothing in this Section VI shall prevent Defendant from managing the RP Pondwater, Dearsenate, and Raffinate, after appropriate notice to EPA and LDEQ, in accordance with any other alternative that fully complies with the above-cited regulations.

14.     Innophos shall not send RP Pondwater, Dearsenate, or Raffinate to the PCS Geismar Facility, except as expressly allowed by the provisions of this Decree or any final permits obtained by PCS Nitrogen allowing it to accept Raffinate; nor shall Innophos send RP Pondwater, Dearsenate, or Raffinate for:

        a.     treatment;

        b.     storage;

        c.     disposal; or

        d.     use in a manner that constitutes disposal, as that term is defined in

40 C.F.R. §§ 261.2(c)(1) and 266.20;

to any other facility that is not authorized to receive hazardous wastes under the EQA or RCRA

or another state's, or, if applicable, locality's hazardous waste laws or regulations or authorized

state program.  Within thirty (30) Days of the Effective Date of this Decree, Defendant shall

submit to EPA and LDEQ a letter documenting its compliance with this Paragraph with regard to

the Dearsenate.  This letter shall be certified in accordance with Paragraph 25.  Defendant's

process changes that have already been made to what is now the Dearsenate, as described in

Section I, Paragraph F, together with the payment of a civil penalty and other provisions in this

Consent Decree, will resolve the Defendant's violations pertaining to the RP Pondwater that are

alleged in the Complaint.  The container used to accumulate the Dearsenate at the Innophos

Facility is the only unit in Innophos' in-process Green Acid filtration system that Defendant

currently operates as a regulated unit under the EQA, Louisiana Environmental Quality

Regulations, RCRA and the authorized state hazardous waste program.

      15.   <u>Deep-Well Injection.</u>

        a.     Within fourteen (14) Days of receiving notice that Innophos has been

authorized to inject the Raffinate waste either into the PCS Geismar Deep Well System or into

the Innophos Deep Well System, Innophos shall submit to EPA and LDEQ notice of such

authorization and the date on which deep well injection of the Raffinate waste will begin, and

which well system is to be used.  If the PCS Deep Well System is to be used, Innophos, after

providing such notice, shall send the Raffinate waste to the PCS Geismar Facility with

instructions to the PCS Geismar Facility to inject the Raffinate in the PCS Deep Well System.

If the Innophos Deep Well System becomes authorized and operable prior to the PCS Deep Well

System, Innophos shall use the Innophos Deep Well System for Raffinate injection.  At such time as Innophos becomes aware that the PCS Deep Well System is authorized and operable, Innophos may elect which well system to use for Raffinate injection and shall notify EPA and LDEQ of such election within fourteen (14) Days after making such election.  Nothing in this subparagraph precludes Innophos from switching between the Innophos Deep Well System and the PCS Deep Well System for Raffinate injection so long as such injection complies with applicable laws, regulations, and permits.

       b.     In the event that the Innophos Deep Well System is authorized for Raffinate injection prior to the PCS Geismar Deep Well System and Innophos begins to use the Innophos Deep Well System, Innophos may, if the Innophos Deep Well System becomes unable to accept the injection of Raffinate within the first year of injection start-up, send the Raffinate to the PCS Geismar Facility to be added to the PCS Geismar Facility transformation tank and phosphogypsum destined for the phosphogypsum stacks at the PCS Geismar Facility, so long as the following criteria are met:

       i.     Innophos provides written notice to EPA and LDEQ within five (5) business days after it becomes aware that the Innophos Deep Well System is likely to become unable to accept the injection of Raffinate.  Such notice shall contain a description of the problem that may trigger the unavailability of the Innophos Deep Well System, and Innophos' understanding of the possible causes of the problem.

       ii.     Innophos provides written notice to EPA and LDEQ within five (5) business days after the entire Innophos Deep Well System becomes unable to accept the injection of Raffinate.  Such notice shall state the date that injection will be suspended, the expected date that injection will resume, the reason that the well system is unable to accept the injection of

14

Raffinate, and Innophos' anticipated resolution of the problem causing the unavailability of the well system.   Such notice shall also confirm that the PCS Geismar Facility has agreed to accept the Raffinate for routing in the manner described above.

        c.      During the well application and petition process, Innophos shall timely respond to any inquiries made by EPA, LDEQ, and/or LDNR concerning those applications; shall make complete and timely submissions to EPA, or LDEQ, in accordance with Paragraph 21 in Section VII (Reporting Requirements); and shall provide access to the Facility and to its records as described in Section X (Information Collection and Retention).

        d.      In the event that the Innophos Deep Well System becomes unable to accept the injection of Raffinate after the first year of injection start-up, Innophos shall not send the Raffinate to PCS for any purpose other than injection in the PCS Deep Well System, if authorized, without prior written approval from EPA and LDEQ.  EPA and LDEQ's decision whether to allow such Raffinate shipments for a purpose other than well injection, and the conditions that may be imposed on such shipments, are not subject to dispute and review under Section XI of this Consent Decree.  In the event this Consent Decree is terminated pursuant to Section XVIII, Innophos shall not send Raffinate to PCS for any purpose other than injection in the PCS Deep Well System in compliance with all applicable laws and regulations.

        e.      To the extent that the well application or the management or disposal of the Raffinate requires any other permits, authorizations, or other governmental approvals, this Consent Decree shall not be deemed to be such permit, authorization, or approval.

        f.      Aboveground Facilities for the Permitted Underground Injection Control (UIC) Well.  Innophos shall comply with the requirements set forth in the attached Appendix.

16.    In the event that the Triggering Date occurs, Innophos, within seven (7) Days of learning of the Triggering Date, shall submit written notification to EPA and LDEQ, and within nine (9) months of the Triggering Date shall submit to EPA and LDEQ for approval a plan to begin off-site disposal or treatment and management of the Raffinate ("Raffinate Plan") meeting the requirements set forth below.

17.    Innophos may choose whether the Raffinate Plan will address off-site disposal or on-site treatment and management. The Raffinate Plan shall include information fully describing how Innophos intends to effect such disposal or treatment and how it will comply with RCRA and the EQA and their implementing regulations.

a.    Off-site shipment to a treatment, storage, and disposal facility. In the event that Innophos elects to ship the Raffinate off-site for disposal, the Raffinate Plan shall include a schedule documenting that shipments will begin within sixty (60) Days after EPA approves the Raffinate Plan. Such off-site shipment may only be made to an authorized hazardous waste treatment, storage, and disposal facility.

b.    On-site Raffinate treatment. In the event that Innophos elects to undertake treatment on-site and return the treated Raffinate to the PCS Geismar Facility for beneficial use, the Raffinate Plan shall include a schedule documenting that treatment and management will begin within two and one-half (2½) years after EPA approves the Raffinate Plan. EPA may agree to extend this date upon request by Innophos and, after consultation with LDEQ. EPA's decision on such an extension request is subject to the Dispute Resolution provisions in Paragraphs 49-51 but not judicial review pursuant to Paragraph 52. At any time following submission of a Raffinate Plan electing on-site Raffinate treatment, Innophos may change its election to off-site treatment upon notice to EPA and LDEQ and the submission to EPA for

16

approval, in consultation with LDEQ, of a new Raffinate Plan conforming to Paragraph 17.a

above.  Any equipment, including ancillary piping, associated with either the (1) treatment of the

Raffinate for beneficial use at the PCS Geismar Facility, or (2) storage of the Raffinate prior to

treatment and the treated Raffinate prior to return to the PCS Geismar Facility, shall meet the

standards that are described in 40 C.F.R. Part 265, Subparts J, AA, BB and CC, as applicable.

Such management and treatment must meet the following standards in order for the treated

Raffinate to be sent to the PCS Geismar Facility:

        i.      The treated Raffinate contains less than 1 mg/L of cadmium.

        ii.      Defendant may only send PCS Geismar Raffinate that exhibits a

pH level less than 2.0 if it can document, pursuant to Paragraph 18, that the PCS Geismar

Facility will beneficially use the Raffinate via the addition of the Raffinate to the PCS Geismar

Facility transformation tank and phosphogypsum destined for the phosphogypsum stacks at the

PCS Geismar Facility, or via another beneficial use approved by EPA and LDEQ.

        iii.      Defendant may only send to the PCS Geismar Facility Raffinate

that contains chromium greater than 5 mg/L if it can document, based on a demonstration

approved in advance by EPA and LDEQ pursuant to Section XIV (Notices), that: (1) the

chromium in the waste is exclusively or nearly exclusively trivalent chromium; (2) the waste is

generated from an industrial process that does not generate hexavalent chromium; and, (3) the

waste is managed in non-oxidizing environments.  PCS Nitrogen has submitted information to

the Plaintiffs demonstrating that, as of the date of lodging of this Consent Decree, the Raffinate

meets these requirements.  If, in the future, this information is no longer accurate, Innophos must

ensure that the chromium concentration remains less than 5 mg/L, or provide information to EPA

and LDEQ demonstrating that the conditions of 40 C.F.R. § 261.4(b)(6)(i) (LAC

33:V.105(D)(2)(f)) are met in order to be able to send the Raffinate as described above.

     iv.  Defendant shall manage any treatment residue generated on-site in

accordance with RCRA and the authorized Louisiana Hazardous Waste Program.

   18.  At least sixty (60) Days prior to any shipment of treated Raffinate to the PCS

Geismar Facility, Innophos shall submit to EPA and LDEQ documentation establishing that PCS

Nitrogen (or any successor) has legally committed to accept the treated Raffinate so long as the

conditions in Paragraph 17.b. are met, and committed to beneficially use the Raffinate.

   19.  If Innophos elects to treat Raffinate as described in Paragraph 17.b., then within

twenty (20) Days after the first shipment of treated Raffinate to the PCS Geismar Facility,

Innophos shall submit a notification to EPA and LDEQ indicating the date that treatment of the

Raffinate began and the date of first shipment of treated Raffinate to the PCS Geismar Facility.

   20.  Following the Effective Date but prior to commencement of the Raffinate

management option that will be implemented pursuant to Paragraphs 15 or 17, Innophos shall

continue to manage Raffinate consistent with its current practice of sending it to the PCS

Geismar Facility.  If Innophos ships Raffinate off-site that does not meet Toxicity Characteristic

Leaching Procedure (TCLP) standards (other than to the PCS Geismar Facility) as described in

Paragraph 17.a, Innophos shall notify EPA and LDEQ within twenty (20) Days after the first

such shipment.

## VII.  REPORTING REQUIREMENTS

21.     Within ten (10) Days after six (6) months have elapsed since the Effective Date of this Consent Decree, and within ten (10) Days of every six (6) months thereafter, Defendant shall submit to EPA and LDEQ a report documenting the following information for each preceding six (6) month period:

        a.      Any technical or regulatory issues that have arisen regarding Dearsenate treatment and, if resolved, how resolved;

        b.      The status of injection well applications, exemption approval requests and any other pending regulatory authorizations related to the Innophos deep wells, including a summary of any requests EPA, LDEQ, and LDNR have made of Innophos concerning those applications in the preceding six (6) months, and a summary of Innophos' responses, including the results of any testing required by EPA, LDEQ, or LDNR;

        c.      The status of any deep well design and construction efforts;

        d.      A description of any transfers made of treated Raffinate to the PCS Geismar Facility for any beneficial reuse pursuant to Paragraph 17.b.; and

        e.      Manifests for any shipments of Raffinate that are made to facilities other than the PCS Geismar Facility pursuant to Paragraph 17.a.

22.     If Defendant violates, or determines that it will violate, any requirement of this Consent Decree, Defendant shall notify the United States and LDEQ of such violation and its likely duration, in writing, within twenty (20) Days after the Day Defendant first becomes aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  Nothing in this Paragraph or the

following Paragraph relieves Defendant of its obligation to provide the notice required by

Section IX of this Consent Decree (Force Majeure).

     23.     Whenever any violation of this Consent Decree, or any other event affecting

Defendant's performance under this Decree, may pose an immediate threat to the public health

or welfare or the environment, Defendant shall notify EPA and LDEQ orally or by electronic or

facsimile transmission as soon as possible, but no later than twenty-four (24) hours after

Defendant first learns of the violation. This procedure is in addition to the requirements set forth

in the preceding Paragraph. This notice requirement does not relieve Innophos of its obligation

to comply with any federal and state laws applicable to the violation or event.

     24.     In the event that: 1) material or substantial alterations to the Facility or its

operations; 2) the receipt of information not available at the time of the approval of a deliverable

submitted pursuant to Section VI (Compliance Requirements) or Section VII (Reporting

Requirements) that would have justified changes to that deliverable; or 3) new statutory

requirements or regulations, reveal any need to modify any submission, report, or other item

previously approved by EPA or LDEQ, EPA or LDEQ may notify Defendant of such

modification and/or require the submission to be revised in accordance with EPA or LDEQ

direction and resubmitted to EPA or LDEQ for approval.

     25.     Each report submitted by Defendant under this Section shall be signed by an

official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were
> prepared under my direction or supervision in accordance with a system designed
> to assure that qualified personnel properly gather and evaluate the information
> submitted. Based on my inquiry of the person or persons who manage the system,
> or those persons directly responsible for gathering the information, the
> information submitted is, to the best of my knowledge and belief, true, accurate,
> and complete. I am aware that there are significant penalties for submitting false

information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

26.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by RCRA, its implementing regulations, the EQA, or the Louisiana Hazardous Waste Regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

27.     Any information provided pursuant to this Consent Decree may be used by the United States and/or LDEQ in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII.  **STIPULATED PENALTIES**

28.     Defendant shall be liable for stipulated penalties to the United States and LDEQ for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

29.     <u>Late Payment of Civil Penalty</u>.  If Defendant fails to pay the civil penalty required to be paid under Section V of this Decree (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $1000 per Day for each Day that the payment is late, for the first ten (10) Days, together with interest on the civil penalty from its due date at the rate described in Paragraph 10.  Thereafter, Defendant shall pay $3000 per day for each Day that the payment is late with interest as described above.

30.     a.   Reporting/Notification Requirements.  The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Section VII of this Consent Decree, or for any failure to provide timely notice due pursuant to Paragraphs 14-20:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th Day |
| $1000 | 15th through 30th Day |
| $2000 | 31st Day and beyond |

b.      Non-Reporting/Notification Requirements. The following stipulated penalties shall accrue per violation per day for each violation of this Decree not covered by the preceding Paragraph:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1000 | 1st through 14th Day |
| $2000 | 15th through 30th Day |
| $3000 | 31st Day and beyond |

31.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation of the Consent Decree occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

32.     Defendant shall pay any stipulated penalty within thirty (30) Days of receiving the United States' or LDEQ's written demand.

22

33.    Stipulated penalties shall be paid in the following proportions: fifty percent (50%) to the United States and fifty percent (50%) to LDEQ.

34.    The United States and LDEQ may in the unreviewable exercise of their discretion reduce or waive stipulated penalties otherwise due them under this Consent Decree. The determination by one Plaintiff not to seek stipulated penalties, or to subsequently waive or reduce the amount it seeks, shall not preclude the other Plaintiff from seeking the full amount of the stipulated penalties owed.

35.    Defendant shall pay stipulated penalties owing to the United States and LDEQ in the manner set forth and with the confirmation notices required by Paragraph 11, except that the transmittal letters shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

36.    If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. §1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or LDEQ from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

37.    Subject to the provisions of Section XII of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States and/or LDEQ for Defendant's violation of this Consent Decree or applicable law.  Where a violation of this Consent Decree is also a violation of RCRA, its implementing regulations, the EQA or the Louisiana Hazardous Waste Regulations, Defendant shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

## IX. **FORCE MAJEURE**

38.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise best efforts to fulfill the obligation includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

39.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission as soon as possible, as provided in Section XIV of this Decree (Notices), but not later than seventy-two (72) hours after the time when Defendant first knew that the event might cause a delay.  Within seven (7) Days thereafter, Defendant shall provide in writing to the EPA and LDEQ an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force

24

majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or reasonably should have known.

40.     If EPA, after a reasonable opportunity for review and comment by LDEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA and LDEQ for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

41.     If EPA, after a reasonable opportunity for review and comment by LDEQ, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision and the reasons therefor.

## X. INFORMATION COLLECTION AND RETENTION

42.     The United States, LDEQ, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility, at all reasonable times, upon presentation of credentials, to:

a.     monitor the progress of activities required under this Consent Decree, including installation and operation of any deep well or treatment system;

       b.      verify any data or information submitted to the United States, LDEQ, or LDNR in accordance with the terms of this Consent Decree;

       c.      obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

       d.      obtain documentary evidence, including photographs and similar data; and

       e.      assess Defendant's compliance with this Consent Decree.

43.      Upon request, Defendant shall provide EPA and LDEQ, or their authorized representatives, splits of any samples taken by Defendant.  Upon request, EPA and LDEQ shall provide Defendant splits of any samples taken by EPA or LDEQ.  Any request that is made under this Paragraph must be made in advance of the sampling event with enough advance notice to allow the parties to adequately prepare and mobilize the appropriate resources.

44.      Until five (5) years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control as of May 15, 2016, or that come into its or its contractors' or agents' possession or control after May 15, 2016, and that relate in any manner to Defendant's performance of its obligations under Sections V, VI, and VII of this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or LDEQ, Defendant shall provide copies of any non-privileged documents, records, or other information required to be maintained under this Paragraph.

45.     At the conclusion of the information-retention period provided in the preceding

Paragraph, Defendant shall notify the United States and LDEQ at least forty-five (45) Days prior

to the destruction of any documents, records, or other information subject to the requirements of

the preceding Paragraph and, upon request by the United States or LDEQ, Defendant shall

deliver any such documents, records, or other information to EPA or LDEQ.  Defendant may

assert that certain documents, records, or other information is privileged under the attorney-client

privilege or any other privilege recognized by applicable law.  If Defendant asserts such a

privilege, it shall provide the following: (1) the title of the document, record, or information;

(2) the date of the document, record, or information; (3) the name and title of each author of the

document, record, or information; (4) the name and title of each addressee and recipient;

(5) a description of the subject of the document, record, or information; and (6) the privilege

asserted by Defendant.  Defendant shall not assert a legal privilege for any data, records, or

information (excluding legal advice) generated or received in connection with Defendant's

obligations pursuant to the requirements of this Consent Decree.

46.     Defendant may also assert that information required to be provided  pursuant to

this Consent Decree is protected as Confidential Business Information ("CBI") under 40 C.F.R.

Part 2 or LAC 33:I.Chapter 5.  As to any information that Defendant seeks to protect as CBI,

Defendant shall follow the procedures set forth in 40 C.F.R. Part 2 and LAC 33.I.Chapter 5.

47.     This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States or LDEQ pursuant to applicable

federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of

Defendant to maintain documents, records, or other information imposed by applicable federal or

state laws, regulations, or permits.

## XI. **DISPUTE RESOLUTION**

48.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

49.     Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States and LDEQ a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date of the Notice of Dispute, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with LDEQ, shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

50.     Formal Dispute Resolution.  Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and LDEQ a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

51.     The United States, after consultation with LDEQ, shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless

Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

      52.     Unless otherwise specified in this Consent Decree, Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States and LDEQ, in accordance with Section XIV of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within twenty (20) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

      53.     <u>Standard of Review</u>

          a.     <u>Disputes Concerning Matters Accorded Record Review</u>. In any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, EPA shall compile an administrative record of the dispute containing all Statements of Position, including supporting documentation and referenced data or information, and Innophos shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

        b.        <u>Other Disputes</u>.  In any other dispute brought under this Section, Innophos shall bear the burden of demonstrating that its position complies with and furthers the objectives of this Consent Decree.

        54.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Innophos under this Consent Decree, unless and until final resolution of the dispute so provides or unless ordered by the Court.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute.  If Innophos does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

        55.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

## XII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

        56.     This Consent Decree resolves the civil claims of the United States and LDEQ against Innophos for the violations alleged in the Complaint filed in this action through the date of lodging of this Consent Decree.  For continuing violations alleged in the Complaint, provided that Defendant complies with this Consent Decree from the date of lodging of the Consent Decree through its Effective Date, these claims shall also be resolved through the Effective Date of this Consent Decree, as of the Effective Date; and, provided that Defendant complies with the Consent Decree from the Effective Date of this Consent Decree through the date of termination of this Consent Decree pursuant to Section XVIII (Termination), these claims shall be finally resolved as of the date the Consent Decree terminates.

57.     The Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States or LDEQ to obtain penalties or injunctive relief under RCRA or its implementing regulations, or the EQA, or the Louisiana Hazardous Waste Regulations or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 56.  The Plaintiffs further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

58.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and LDEQ do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of RCRA, 42 U.S.C. § 6901(a) *et seq.*, and La.R.S. 30:2001 *et seq.*, LAC 33:V. Subpart I, or with any other provisions of federal, state, or local laws, regulations, or permits.

59.     This Consent Decree does not limit or affect the rights of Defendant or of the Plaintiffs against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree against Defendant, except as otherwise provided by the doctrine of federal preemption or by other applicable principles of law or precedent.

60.     This Consent Decree shall not be construed to (1) create rights in, or grant any cause of action to, any third party not party to this Consent Decree; or (2) adversely affect or interfere with, or obviate the need for compliance with, the Defendant or any other entity's obligations under any other law, regulation, or agreement, including the Acid Purchase Agreement.

## XIII.  COSTS AND FEES

61.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the Plaintiffs shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties or other costs due but not paid by Defendant.

## XIV.  NOTICES

62.     Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing (or emailed where specified) and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611
Ben Franklin Station
Washington, DC  20044-7611
Re: DOJ No. 90-7-1-08688

with copy to:

Deborah Gitin, Senior Counsel
U.S. Department of Justice (ENRD/EES)
301 Howard Street, Suite 1050
San Francisco, CA  94105
Re: DOJ No. 90-7-1-08688

and

Marcia Moncrieffe
Office of Regional Counsel (6RC-E)
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX  75202

Chief
Compliance Assurance and Enforcement Division
Waste Enforcement Branch (6EN-H)
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue
Dallas, TX  75202-2733

By email: Dougherty.joel@epa.gov

To EPA:

Marcia Moncrieffe
Office of Regional Counsel (6RC-E)
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX  75202

Chief
Compliance Assurance and Enforcement Division
Waste Enforcement Branch (6EN-H)
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue
Dallas, TX  75202-2733

By email: Dougherty.joel@epa.gov

To LDEQ :

Administrator, Enforcement Division
Office of Environmental Compliance
Louisiana Dept. of Environmental Quality
P.O. Box 4312
Baton Rouge, LA  70821-4312

Ted R. Broyles, II
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, LA  70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068
ted.broyles@la.gov

To Defendant:

Chief Executive Officer
Innophos, Inc.
259 Prospect Plains Road, Building A
Cranbury, NJ  08512
Phone: (609) 495-2495

General Counsel
Innophos, Inc.
259 Prospect Plains Road, Building A
Cranbury, NJ  08512
Phone: (609) 495-2495

Chris S. Leason
Gallagher & Kennedy, P.A.
2575 East Camelback Road, Suite 1100
Phoenix, AZ  85016
Phone: (602) 530-8059
Fax: (602) 530-8500
Chris.Leason@gknet.com

63.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

64.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.  EFFECTIVE DATE

65.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.  RETENTION OF JURISDICTION

66.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

## XVII.  MODIFICATION

67.    The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.  Where the modification does not constitute a material change to this Consent Decree, such modification may be made without approval by the Court, and shall be effective upon written agreement among the Parties.

## XVIII.  TERMINATION

68.    After Defendant: (a) has submitted all applicable and required notifications provided for in this Consent Decree; (b) certifies, in accordance with Paragraph 25, that it has been in compliance with the provisions of Section VI and Section VII for a continuous period of one year immediately preceding the Request for Termination and for at least one year following any notifications submitted pursuant to this Consent Decree; (c) certifies, in accordance with Paragraph 25, that during the one year immediately preceding the Request for Termination Raffinate has been managed either by injection into the Innophos Deep Well System, by injection into the PCS Deep Well System, or by off-site shipment to a treatment, storage, and

35

disposal facility that complies with the requirements of Paragraph 17.a; and (d) has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States and LDEQ a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.  In the event that Innophos elects to undertake treatment on-site and return the treated Raffinate to the PCS Geismar Facility for beneficial use pursuant to Paragraph 17.b, termination of this Consent Decree is not available until such return to the PCS Geismar Facility permanently ceases.

69.     Following receipt by the Plaintiffs of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with LDEQ, does not agree that the Consent Decree may be terminated, Defendant may invoke Dispute Resolution under Section XI of this Consent Decree.  However, all time periods and deadlines established under Section XI (Dispute Resolution) shall be extended by sixty (60) Days, or more by the agreement of the Parties.  If the United States, after consultation with LDEQ, agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.  The Parties shall endeavor to make such submission within forty-five (45) Days after receiving the Request for Termination.  Upon termination of this Decree by the Court, Defendant shall have no further obligations pursuant to this Consent Decree, except for those described in Paragraphs 44 and 45 of this Decree.

## XIX.  PUBLIC PARTICIPATION

70.    This Consent Decree shall be lodged with the Court for a period of not less than forty five (45) Days for public notice and comment in accordance with 28 C.F.R.§ 50.7 and La. R.S. 30:2050.7.  Each of the Plaintiffs (the United States and LDEQ) reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, inadequate, or inconsistent with the law.  Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States or LDEQ has notified Defendant in writing that it no longer supports entry of the Decree.

## XX.  SIGNATORIES/SERVICE

71.    Each undersigned representative of Defendant and LDEQ, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

72.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXI.   INTEGRATION

73.     This Consent Decree constitutes the final, complete, and exclusive agreement and

understanding among the Parties with respect to the settlement embodied in the Decree and

supersedes all prior agreements and understandings, whether oral or written, concerning the

settlement embodied herein.  No other document, nor any representation, inducement,

agreement, understanding, or promise, constitutes any part of this Decree or the settlement it

represents, nor shall it be used in construing the terms of this Decree.

## XXII.  FINAL JUDGMENT

74.     Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court as to the United States, LDEQ, and

Defendant.


Dated and entered this _3_ day of _October_ 2017.


_Shelly D Dick_
UNITED STATES DISTRICT JUDGE
Middle District of Louisiana

FOR PLAINTIFF UNITED STATES OF AMERICA:

Date: 1/12/2017

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Date: 1/12/2017

DEBORAH A. GITIN (Lead Attorney)
Senior Counsel (CA Bar #284947)
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, CA 94105
Phone: (415) 744-6488
Fax: (415) 744-6476
Email: deborah.gitin@usdoj.gov

J. WALTER GREEN
United States Attorney
Middle District of Louisiana

SUSAN C. AMUNDSON (LBN 22710)
Assistant U.S. Attorney
777 Florida Street, Suite 208
Baton Rouge, LA 70801
Phone: (225) 389-0443
Fax: (225) 389-0685
Email: susan.amundson@usdoj.gov

FOR THE ENVIRONMENTAL PROTECTION AGENCY:

Date: 1/9/17

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Washington, DC  20460

Date: 1/5/17

SUSAN SHINKMAN
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Washington, DC  20460

Date: 1/5/17

PETER J. RAACK
Attorney Advisor
Waste and Chemical Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Washington, DC  20460

FOR THE ENVIRONMENTAL PROTECTION AGENCY:


Date: 12/23/2016

STACEY B. DWYER, P.E.
Acting Director
Compliance Assurance and
   Enforcement Division
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue
Dallas, TX  75202


Date: 12/20/2016

MARCIA E. MONCRIEFFE
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 6
1445 Ross Avenue
Dallas, TX  75202

PRELIMINARY APPROVAL BY PLAINTIFF LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY:

Date: 12 - 27 - 16

LOURDES ITURRALDE
Assistant Secretary
Office of Environmental Compliance
Louisiana Dept. of Environmental Quality

Date: 12-27-16

TED R. BROYLES, II (La. Bar Roll #20456)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, LA  70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068

42

FINAL APPROVAL BY PLAINTIFF LOUISIANA DEPARTMENT OF ENVIRONMENTAL
QUALITY:

_____          Date: _6-15-17_

LOURDES ITURRALDE
Assistant Secretary
Office of Environmental Compliance
Louisiana Dept. of Environmental Quality


_____          Date: _1-15-17_

TED R. BROYLES, II (La. Bar Roll #20456)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, LA  70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068

FOR DEFENDANT INNOPHOS, INC.:

_Kim Ann Mink_

KIM ANN MINK
Chief Executive Officer

Date: _12 - 21 - 16_